## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANONYMOUS,<br><br>                      Plaintiffs,<br><br>      vs.<br><br>ANONYMOUS,<br><br>                    Defendants. | CASE NO.: 3:17 CV 1790 - WWE<br><br>**FILED UNDER SEAL AND IN CAMERA**<br><br>**PURSUANT TO:**<br>**31 U.S.C. § 3730(B)(2)**<br><br>**JURY TRIAL DEMANDED**<br><br><br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER** |

## COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE FALSE CLAIMS ACTS AND THE ANTI-KICKBACK STATUTE

David A. Slossberg
(dslossberg@hssklaw.com)
**HURWITZ, SAGARIN, SLOSSBERG & KNUFF, LLC**
147 North Broad Street
Milford, CT 06460
Phone: 203-877-8000
Fax: 203-878-9800

*Local Counsel for Relator*

Stanley D. Bernstein
(bernstein@bernlieb.com)
Michael S. Bigin
(bigin@bernlieb.com)
**BERNSTEIN LIEBHARD LLP**
10 East 40th Street
New York, NY 10016
Phone: (212) 779-1414
Fax: (212) 779-3218

*Attorneys for Relator*

FILED
2017 OCT 25 PM 1 42
U.S. DISTRICT COURT
NEW HAVEN, CT.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KEVIN G. MURPHY<br><br>                              Plaintiffs,<br><br>vs.<br><br>PROSPECT ECHN, INC. (F/K/A EASTERN CONNECTICUT HEALTH NETWORK, INC.), PROSPECT CT MEDICAL FOUNDATION, INC. (F/K/A EASTERN CONNECTICUT MEDICAL PROFESSIONALS FOUNDATION, INC.), EVERGREEN ENDOSCOPY CENTER, LLC, DR. ALI HEMACHA, DR. RAJEEV ATTAM, PROSPECT CT, INC., AND PROSPECT MEDICAL HOLDINGS, INC.<br><br>                              Defendants. | CASE NO.:<br><br><u>FILED UNDER SEAL AND IN CAMERA</u><br><br>PURSUANT TO:<br>31 U.S.C. § 3730(B)(2)<br><br>JURY TRIAL DEMANDED<br><br>DO NOT PLACE IN PRESS BOX<br>DO NOT ENTER ON PACER |

## COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE FALSE CLAIMS ACTS AND THE ANTI-KICKBACK STATUTE

Relator Kevin G. Murphy (hereinafter "Relator"), through his counsel Bernstein Liebhard

LLP, brings this civil action complaint (the "Complaint") on behalf of Plaintiff the United States

of America (hereinafter "Plaintiff" or the "Government") against Defendant Prospect ECHN,

Inc. f/k/a Eastern Connecticut Health Network, Inc. ("ECHN"), Prospect CT Medical

Foundation, Inc. f/k/a Eastern Connecticut Medical Professionals Foundation, Inc. ("ECMP"),

Dr. Ali Hemacha, Dr. Rajeev Attam, Evergreen Endoscopy Center, LLC ("EEC"), Prospect CT,

Inc. ("PCT"), and Prospect Medical Holdings, Inc. ("PMH") (collectively "Defendants").  The

factual allegations set forth herein are based on Relator's knowledge of the facts and

circumstances described below, and upon information and belief where indicated. Relator

believes that substantial additional evidentiary support will exist for the allegations set forth

herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      Defendants violated the "Social Security Act" (42 U.S.C. §§ 1395 et seq.) through

an improper patient referral arrangement, which caused Medicare and Medicaid reimbursements

to be prohibited remuneration for owners of an ambulatory surgical center ("ASC"). These

violations also form the basis for additional claims against Defendants for violations of the

"False Claims Act" (42 U.S.C. §§ 1395 et seq.) and the "Connecticut False Claims Act" (Conn.

Gen. Stat. § 4-275).

2.      Pursuant to the Social Security Act, a payment made, whether directly or

indirectly, in return for referrals of Medicare and Medicaid reimbursed procedures is an illegal

kickback payment.

3.      ECHN-controlled employees referred patients to the ASC EEC for Medicare and

Medicaid reimbursed procedures, after which EEC used the Medicare and Medicaid

reimbursements to pay investment income to ECHN and to those same ECHN-controlled

employees.

4.      None of the Social Security Act's safe harbor exceptions shield Defendants from

liability for paying investment income to a hospital system that was derived from Medicare and

Medicaid referrals made by the hospital system.

5.      Defendants also specifically acted contrary to the safe harbor provisions in the

Social Security Act. For example, Defendants improperly made a loan to Dr. Hemacha to invest

in EEC, and Defendants did not disclose that EEC was sharing profits with referring doctors

Attam and Hemacha or with ECHN.

6.    As a result of this unlawful conduct, Defendants received over $19 million for Medicare and Medicaid procedures.  Accordingly, including applicable fines and penalties, the Government may repatriate over $59 million from Defendants.

7.    The False Claims Act allows any person with original information about a false or fraudulent claim made against the Government to bring an action for himself and the Government, and to share in any recovery.  31 U.S.C. § 3730(b)(1).  The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to provide the Government with time to conduct its own investigation and determine whether to join the suit.  31 U.S.C. § 3730(b)(2).

8.    Relator, on behalf of the Plaintiff, seeks to recover all available damages, civil penalties, and any other applicable relief for Defendants' False Claims Act, Social Security Act, and Connecticut False Claims Act violations, as well as a fee that the Court deems appropriate.

## PARTIES

9.    Kevin Murphy (the "Relator") is a citizen and resident of the State of New York. He is an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and states that to his knowledge, the information contained herein concerning Defendants' alleged violations has not been fully disclosed.  The Relator will seek a fee from any recovery.

10.    The Relator was the Chief Financial Officer of ECHN between July 2001 and August 2010, and Executive Vice President/Treasurer between August 2010 and September 2013.  The Relator was responsible for the financial operations and the financial reporting of ECHN and became aware of the facts and circumstances detailed herein concerning Defendants' violations of the False Claims Act.

11.    Defendant ECHN is a not-for-profit health care system located at 71 Haynes Street, Manchester, CT.  ECHN is a 50% owner of EEC and wholly owns and operates various

3

other entities including ECMP, Rockville General Hospital, Incorporated ("Rockville Hospital") (Medicare No. 070012), Manchester Memorial Hospital ("Manchester Hospital") (Medicare No. 070027), and the Medical Practice Partners, LLC ("MPP").

12.     Defendant ECMP is a tax exempt medical foundation that operates physician practices and provides contracted services to hospitals including Rockville Hospital and Manchester Hospital.  ECMP is located at 71 Haynes Street, Manchester, CT.  ECMP is a wholly owned subsidiary of ECHN and ECHN is the sole member of ECMP.

13.     Defendant EEC is an ASC located at 2400 Tamarack Avenue, Suite 100, South Windsor, CT (Medicare No. 070001052).  EEC was incorporated in the State of Connecticut as a Domestic Limited Liability Corporation on April 26, 2006.  EEC is a joint venture between ECHN (controlling Class A shares accounting for 50% ownership) and certain physician investors (controlling Class B shares accounting for the remaining 50% ownership).  EEC began operations in 2008 and specializes in the delivery of endoscopic procedures, colon cancer detection, and colon cancer prevention.  Medicare and Medicaid-covered patients account for approximately 45% of EEC's yearly patient population.

14.     Defendant Dr. Ali Hemacha is a gastroenterologist located in Vernon, CT.  Dr. Hemacha was employed by ECHN through ECMP.  Dr. Hemacha is a Class B shareholder of EEC and receives income from EEC.  Dr. Hemacha has been listed in filings with the Connecticut Secretary of State as an officer, member, and president of EEC.  Dr. Hemacha's initial ownership of EEC was approximately 8%, which likely increased as three of the EEC founders retired in 2013, and by 2015, Dr. Hemacha was one of only three Class B shareholders of EEC.

15.    Defendant Dr. Rajeev Attam is a gastroenterologist, who was previously located in Manchester, CT, but relocated to California in 2010. Dr. Attam was employed by ECHN through ECMP between 2006 and 2010. Dr. Attam was a Class B shareholder of EEC and received income from EEC. Dr. Attam's initial ownership in EEC was approximately 8%. Dr. Attam left ECMP and sold his full interest in EEC to the remaining Class B shareholders in approximately 2010. Dr. Attam now practices medicine with Kaiser Permanente in California.

16.    Defendant PCT is owned by PMH and was incorporated in Delaware. PCT was identified by PMH as the sole member of PMH's ECMP.

17.    Defendant PMH is a health care services company that is located in Los Angeles, California. PMH owns and operates thirteen acute care and behavioral hospitals and a network of specialty and primary care clinics throughout California, Texas, and Rhode Island. Effective October 1, 2016, PMH acquired ECHN and all its interests including those in EEC, ECMP, Manchester Hospital, and Rockville Hospital.

<u>**JURISDICTION AND VENUE**</u>

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" set forth in this Complaint.

19.    Personal jurisdiction and venue are proper in this District pursuant to 28 U.S.C. §§ 139l(b) and 1395(a) and 31 U.S.C. § 3732(a), as Defendants are found in, has or had an agent or agents, has or had contacts, and transacts or transacted business in this District.

## RELEVANT LAW

20.     The United States, through the Department of Health and Human Services

("HHS"), administers the Hospital Insurance Program for the Aged and Disabled established by

Part A ("Medicare Part A Program") and the Supplementary Medical Insurance Program

established by Part B ("Medicare Part B Program"), Title XVIII, of the Social Security Act under

42 U.S.C. §§ 1395 et seq.  The Medicare Part A and Medicare Part B programs are federally

financed health insurance systems for persons who are aged 65 and over and those who are

disabled.  HHS has delegated the administration of the Medicare Program to the Health Care

Financing Administration ("HCFA"), a component of HHS.  Another component of HHS, the

Office of Inspector General ("OIG") is responsible for investigating Medicare fraud and abuse,

as well as issuing regulations and instructions that implement the Medicare and Medicaid fraud

and abuse authorities

21.     The "Anti-Kickback Statute" of the Social Security Act states that:

(b)(1) Whoever knowingly and willfully solicits or receives any remuneration
(including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly,
in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging
for the furnishing of any item or service for which payment may be made in whole
or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending
purchasing, leasing, or ordering any good, facility, service, or item for which
payment may be made in whole or in part under Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than
$25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including
any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or
in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. [42 U.S.C. 1320a–7b(b).]

22.    In addition to the criminal penalties, violations of the Social Security Act also have civil penalties. A violator of 42 U.S.C. 1320a-7b(b) is subject to a $50,000 fine for each such act and:

. . . such a person shall be subject to an assessment of not more than 3 times the amount claimed for each such item or service in lieu of damages sustained by the United States or a State agency because of such claim (or, in cases under paragraph (7), damages of not more than 3 times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose; or in cases under paragraph (9), an assessment of not more than 3 times the total amount claimed for each item or service for which payment was made based upon the application containing the false statement or misrepresentation of a material fact). In addition the Secretary may make a determination in the same proceeding to exclude the person from participation in the Federal health care programs (as defined in section 1320a-7b(f)(1) of this title) and to direct the appropriate State agency to exclude the person from participation in any State health care program. [42 U.S.C.A. § 1320a-7a.]

23.    The Code of Federal Regulations also sets forth the rules for excluding entities from the receiving Medicare and Medicaid payments, and clarifies violations of the Anti-Kickback Statute as follows:

42 C.F.R. 1001.951   Fraud and kickbacks and other prohibited activities.

(a) Circumstance for exclusion. (1) Except as provided for in paragraph (a)(2)(ii) of this section, the OIG may exclude any individual or entity that it determines has committed an act described in section 1128B(b) of the Act.

(2) With respect to acts described in section 1128B of the Act, the OIG—

(i) May exclude any individual or entity that it determines has knowingly and willfully solicited, received, offered or paid any remuneration in the manner and

for the purposes described therein, irrespective of whether the individual or entity may be able to prove that the remuneration was also intended for some other purpose; and

(ii) Will not exclude any individual or entity if that individual or entity can prove that the remuneration that is the subject of the exclusion is exempted from serving as the basis for an exclusion.

\*\*\*

(c) Limitations. The OIG may not impose an exclusion under this section more than 10 years after the date when an act which is described in section 1128B(b) of the Act occurred.  [42 C.F.R. § 1001.951]

24.     The Code of Federal Regulations also provides safe harbors for certain situations

that violate the Anti-Kickback Statute, but will not be treated as criminal offenses under the

Anti-Kickback Statute.  The Code of Federal Regulations at 42 C.F.R. §1001.952 states that:

The following payment practices shall not be treated as a criminal offense under section 1128B of the Act and shall not serve as the basis for an exclusion:

(a) Investment interests. As used in section 1128B of the Act, "remuneration" does not include any payment that is a return on an investment interest, such as a dividend or interest income, made to an investor as long as all of the applicable standards are met within one of the following three categories of entities:

[Generally:  (1) the investment interest is in a security registered with the SEC; (2) the investor in the position to make or influence referrals, furnish items, services, or otherwise generate business for the entity, may not hold more than 40% interest in the entity; and (3) the investment is in an underserved area.]

25.     The Code of Federal Regulations at 42 C.F.R. §1001.952 specifically provides a

safe harbor for ASC's such as EEC:

(r) Ambulatory surgical centers. As used in section 1128B of the Act, "remuneration" does not include any payment that is a return on an investment interest, such as a dividend or interest income, made to an investor, as long as the investment entity is a certified ambulatory surgical center (ASC) under part 416 of this title, whose operating and recovery room space is dedicated exclusively to the ASC, patients referred to the investment entity by an investor are fully informed of the investor's investment interest, and all of the applicable standards are met within one of the following four categories—

\*\*\*

8

(4) Hospital/Physician ASCs—If at least one investor is a hospital, and all of the remaining investors are physicians who meet the requirements of paragraphs (r)(1), (r)(2) or (r)(3) of this section; group practices (as defined in this paragraph) composed of such physicians; surgical group practices (as defined in this paragraph); or investors who are not employed by the entity or by any investor, are not in a position to provide items or services to the entity or any of its investors, and are not in a position to refer patients directly or indirectly to the entity or any of its investors, all of the following eight standards must be met—

(i) The terms on which an investment interest is offered to an investor must not be related to the previous or expected volume of referrals, services furnished, or the amount of business otherwise generated from that investor to the entity.

(ii) The entity or any investor (or other individual or entity acting on behalf of the entity or any investor) must not loan funds to or guarantee a loan for an investor if the investor uses any part of such loan to obtain the investment interest.

(iii) The amount of payment to an investor in return for the investment must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor.

(iv) The entity and any hospital or physician investor must treat patients receiving medical benefits or assistance under any Federal health care program in a nondiscriminatory manner.

(v) The entity may not use space, including, but not limited to, operating and recovery room space, located in or owned by any hospital investor, unless such space is leased from the hospital in accordance with a lease that complies with all the standards of the space rental safe harbor set forth in paragraph (b) of this section; nor may it use equipment owned by or services provided by the hospital unless such equipment is leased in accordance with a lease that complies with the equipment rental safe harbor set forth in paragraph (c) of this section, and such services are provided in accordance with a contract that complies with the personal services and management contracts safe harbor set forth in paragraph (d) of this section.

(vi) All ancillary services for Federal health care program beneficiaries performed at the entity must be directly and integrally related to primary procedures performed at the entity, and none may be separately billed to Medicare or other Federal health care programs.

(vii) The hospital may not include on its cost report or any claim for payment from a Federal health care program any costs associated with the ASC (unless such costs are required to be included by a Federal health care program).

(viii) The hospital may not be in a position to make or influence referrals directly or indirectly to any investor or the entity.

26.    All exceptions to the general rule prohibiting receipt of any remuneration either directly or indirectly in return for referrals to entities furnishing a service for which payment may be made under a Federal health care program are strictly construed.

27.    The Secretary of HHS set strict requirements for the ASC exception because "HHS was concerned that physician ownership of ambulatory surgical centers could lead to violations of the Anti–Kickback Act because the promise of higher dividends (which would presumably be roughly proportional to the number of patients using the center) could provide a financial incentive for physician-owners to refer patients to the center. *See* Medicare and State Health Care Programs, 64 Fed. Reg. at 63, 536–37.

## SUBSTANTIVE ALLEGATIONS

**A.    ECHN Received Illegal Investment Income as a Result of Referrals Made by Its Employees, Who Were Physician Investors of EEC**

28.    ECHN received indirect remuneration through investment income generated by referrals it made to EEC though its employees for Medicare and Medicaid reimbursed procedures for which there is no safe harbor exception shielding liability for violating the Anti-Kickback Statute.

29.    In order for a hospital/physician owned ASC to operate in accordance with the Social Security Act, the hospital may not be in a position to make or influence referrals directly or indirectly to any investor or the entity.  42 C.F.R. § 1001.952(r)(4)(viii).

30.    ECHN is a healthcare system that owns 100% of Rockville and Manchester Hospitals.

31.    ECHN owns 100% of ECMP, which employed physicians to support Rockville and Manchester Hospitals.

32.    Dr. Hemacha and Dr. Attam were physicians employed by ECMP and were subject to ECHN's direction and control.

33.    Dr. Hemacha and Dr. Attam were part of the gastroenterologist physician group that requested ECHN to partner with and form the ASC EEC.

34.    ECHN and the future Class B shareholders of EEC did not to seek an OIG advisory opinion as to whether ECHN could legally participate in a joint venture with EEC.

35.    Prior to EEC's operation, the Relator was privy to several discussions where ECHN and the physician investors discussed how having Dr. Hemacha and Dr. Attam as ECHN employees and owners of EEC caused EEC to fail the ASC safe harbor exception of the Anti-Kickback Statute because EEC would pay ECHN investment income generated from referrals by ECHN's employees to EEC.

36.    In approximately 2008, EEC began operating as a joint venture between ECHN (sole Class A shareholder) and the Class B shareholders, which included Dr. Hemacha and Dr. Attam.

37.    Dr. Hemacha and Dr. Attam treated Medicare and Medicaid patients at Rockville Hospital, Manchester Hospital, and at EEC.

38.    Dr. Hemacha and Dr. Attam both referred Medicare and Medicaid patients to EEC for personal benefit while employed by ECHN's wholly owned subsidiary ECMP.

39.    ECHN through ECMP was in a position to make or influence Medicare and Medicaid patient referrals directly or indirectly to EEC as a result of its employment and control over Dr. Hemacha and Dr. Attam.

40.    Medicare and Medicaid patients referred by Dr. Hemacha and Dr. Attam to EEC caused impermissible remuneration to ECHN.  ECHN received 50% of the profits of EEC as a

result of its 50% ownership of EEC.  Dr. Hemacha and Dr. Attam received a percentage of the EEC's profits in addition to their salaries at ECHN's ECMP.

41.     In 2010, Dr. Attam moved to California and left ECHN's employment.  At that time, Dr. Attam sold his EEC shares back to the remaining EEC Class B shareholders including Dr. Hemacha at three times the original investment.

42.     The Relator participated in various meetings and discussions between 2011 through 2013, where the Relator and ECHN/ECMP Board Leadership and ECHN/ECMP Senior Management (including Dr. Anthony Distefano (ECHN Trustee), Peter Karl (CEO of ECHN), David Neuhaus (ECMP's Medical Director), Dennis O'Neill (ECHN Chairman of the Board, Board Chair, and Medical Director of Pathology), Joel Reich (Senior Vice President of Medical Affairs), Greg Williams (Vice President of ECMP and President of MPP), and ECMP corporate staff) discussed the issues and conflicts of Dr. Hemacha's employment at ECHN/ECMP and his ownership of EEC.  At these meetings and discussions, the Relator, other Senior Leaders, and physicians on the ECMP Board discussed that Dr. Hemacha needed to leave the employ of ECHN/ECMP or sell his interest in EEC.  At the conclusion of each of these meetings and discussions, ECHN/ECMP refused to discharge Dr. Hemacha from its employment and Dr. Hemacha refused to relinquish his ownership interest in EEC.

43.     The Relator attended at least three meetings in 2012 and 2013 where Greg Williams attempted to convince Dr. Hemacha to transition Dr. Hemacha's employment status from ECHN's ECMP to that of an independent self-employed physician.  Dr. Hemacha, however, refused to alter the status quo.  After each meeting, Greg Williams and the Relator updated ECHN CEO Peter Karl and ECHN Chairman of the Board Dennis O'Neill.  These meetings are reflected on the Relator's outlook calendar/emails on ECHN's server.

44.     Throughout the Relator's tenure, Dr. Hemacha was paid through ECHN's ECMP, referred Medicare and Medicaid patients to EEC, and received payments from EEC resulting from his ownership interest.

45.     ECHN's ECMP did not institute any safeguards to limit its ability to direct or influence referrals by Dr. Hemacha to EEC.

46.     ECHN also tracked the referrals made by Dr. Hemacha to EEC, which ultimately became investment income for ECHN and Dr. Hemacha.

47.     On information and belief, Dr. Hemacha's employment at ECHN while owning EEC continues to date at PMH's ECHN and EEC.

48.     ECHN's employment of Dr. Hemacha and Dr. Attam created improper referral income for ECHN, Dr. Hemacha, and Dr. Attam, which subjects these Defendants to criminal and civil liability for violating the Anti-Kickback Statute.

49.     EEC and ECMP paid improper remuneration to ECHN, Dr. Hemacha, and Dr. Attam, which subjects EEC and ECMP to criminal and civil liability for violating the Anti-Kickback Statute.

**B.     EEC's Investors Impermissibly Loaned Cash to Dr. Hemacha to Invest in EEC**

50.     In order for a hospital/physician owned ASC to operate in accordance with the Social Security Act, the entity or any investor must not loan funds to or guarantee a loan for an investor if the investor uses any part of such loan to obtain the investment interest.  42 C.F.R. § 1001.952(r)(4)(ii).

51.     The Relator was a Board Member of EEC and regularly attended meetings as a representative of ECHN between 2006 and 2013.

52.     At EEC Board meetings prior to its operation in 2008, the EEC joint venture parties discussed the desire to have Dr. Hemacha at EEC because of Dr. Hemacha's large patient volume, and Dr. Hemacha's ability to take call at Rockville and Manchester Hospitals for the other physician investors.

53.     The Relator was present at EEC Board meetings where it was proposed that Dr. Hemacha should receive a $36,500 interest free loan from EEC in order to become a Class B shareholder of EEC.

54.     The Relator discussed EEC's proposal to loan Dr. Hemacha funds for an investment interest in EEC with ECHN CEO Peter Karl and ECHN Board Member, Finance Chair, Director of Pathology, and future Chairman of the ECHN Board Dennis O'Neill.  Karl and O'Neill both approved making the loan to Dr. Hemacha.

55.     The Relator was present when all investors in EEC unanimously approved the $36,500 loan for Dr. Hemacha to buy Class B Shares of EEC.  The meeting minutes (generally taken by Bill Wollman, Executive Director) and EEC's organizational minutes (taken by Greg Pepe and Michael Koff) will also detail the actions of the EEC Board.

56.     In 2008, EEC recorded the $36,500 loan to Dr. Hemacha as a receivable on EEC's books.

57.     Dr. Hemacha received an investment interest in EEC equal to that of the Class B shareholders as a result of the $36,500 loan from EEC and its investors (which included ECHN).

58.     In approximately 2010, the $36,500 loan was deducted from Dr. Hemacha's share of the first distribution of EEC's profits to EEC investors.

59.    EEC's loan to Dr. Hemacha caused investment income from EEC to fail the safe harbor exception and subjects ECHN to criminal and civil liability for violating the Anti-Kickback Statute.

**C.    Patients Were Not Informed of ECHN's and Dr. Hemacha's Investment Interests in EEC**

60.    Hospital and physician jointly owned ASCs are required to fully inform patients referred to the ASC by an investor of the investor's investment interest in the ASC. 42 C.F.R. § 1001.952(r).

61.    Patients referred by ECHN (through Dr. Hemacha and Dr. Attam) to EEC were not informed of ECHN's, Dr. Hemacha's, and Dr. Attam's investment interests at EEC.

62.    There was no disclosure program by which patients were advised that EEC was a joint venture with ECHN that entitled ECHN to 50% of EEC's profits.

63.    There was no notice posted in the offices of ECHN, EEC, or on ECHN's or EEC's websites.

64.    There was no disclosure program by which patients were advised that Dr. Hemacha and Dr. Attam were investors in the joint venture of EEC and ECHN that entitled Dr. Hemacha and Dr. Attam to a percentage of EEC's profits.

65.    Dr. Hemacha's position as a second medical director for EEC was also likely payment for increased referrals of ECHN patients to EEC. Dr. Hemacha was one of two medical directors for EEC and received approximately $24,000 per year for this position. EEC, however, did not require two medical directors. According to MGMA Northeast Averages, EEC's $24,000 payment to Dr. Hemacha was in the top 99% percentile for compensation. As EEC's second medical director, Dr. Hemacha was required to review only 10 charts a month for quality and peer review purposes.

66.    ECHN's, Dr. Hemacha's, and Dr. Attam's failure to fully inform patients of their investment interests in EEC caused investment income from EEC to fail the safe harbor exception and subjects ECHN to liability for violating the Anti-Kickback Statute.

**D.    Overpayments and Penalties**

67.    The Social Security Act permits fines and recovery for amounts improperly collected from the Government for Medicare and Medicaid payments.  Civil penalties allow for recovery of up to three times the amount collected, as well as expulsion from the Medicare and Medicaid programs.

68.    According to information known by the Relator and utilization information published by EEC in its Certificate of Need, filed with the State of Connecticut Department of Public Health at Docket No. 15-32051-CON, for the years 2008-2016, EEC conducted approximately 2,600 Medicare and Medicaid procedures per year for a total of approximately 23,400 Medicare/Medicaid Part A procedures.

69.    EEC received approximately $16.4 million in reimbursements from the Medicare and Medicaid Part A procedures between 2008 and 2016.

70.    Dr. Hemacha billed Medicare Part B procedures of approximately $320,000 per year, for a total of approximately $2,880,000 between 2008 and 2016.

71.    Dr. Attam billed Medicare Part B procedures of approximately $80,000 per year, for a total of approximately $384,000 between 2008 and 2010.

72.    The Government may repatriate approximately $16.4 million paid to EEC, $2.88 million paid to Dr. Hemacha, and $384,000 paid to Dr. Attam.  Trebling these damages will allow the Government to receive approximately $59 million.

73.    The Social Security Act, False Claims Act, and the Connecticut False Claims Act also permit civil penalties for each violation.

**E.     Potential Conflicts of Interest Providing Additional Motivation for Violations of the Anti-Kickback Statute and Showing Private Inurement**

74.     Dr. O'Neill was an ECHN Board Member (at least 2003-present), Finance Chair (2007-2011), and the Medical Director of Pathology at Rockville and Manchester Hospitals (2003-present).  ECHN paid Dr. O'Neill an annual medical directorship stipend of approximately $600,000 to oversee the Hospitals' lab and to provide leadership.

75.     Dr. O'Neill was (and is) an owner Eastern Connecticut Pathology Consultants ("ECPC").  ECPC provides Professional Part B services to Manchester Hospital, Rockville Hospital, and other ECHN Enterprises for pathology services pursuant to an "evergreen" franchise contract.

76.     ECHN does not have any ownership interest in ECPC.

77.     Prior to the operation of EEC in 2008, ECHN's Hospitals were the location for all ECHN's Gastrointestinal ("GI") procedures.  ECHN billed on average, per year, approximately $799,000 to Medicare Part A and $1.119 million commercially for GI, pathology technical services.  These reimbursements were built into the Medicare Part A payments for the GI procedures.  ECPC also billed on average, per year, approximately $554,000 to Medicare Part B and $776,000 commercially for GI, pathology professional services at ECHN (total of $1.330 million).

78.     Prior to the operation of EEC, the future Class B shareholders of EEC discussed a business plan to leave ECHN and set up EEC independent from ECHN.  Dr. O'Neill's ECPC risked losing over $1.330 million dollars a year from Part B billings if ECHN'S pathology GI volume was outsourced to a different pathology group.

79.     Dr. O'Neill became one of the chief advocates for ECHN to engage in a joint venture with the future Class B shareholders of EEC despite the fact that the Relator had advised

Dr. O'Neill and the ECHN Board that supporting the EEC joint venture would cause ECHN to lose in excess of $4 million dollars of GI and Colorectal procedure revenue annually.

80.     The Relator states that Dr. O'Neill believed that if ECHN held a 50% interest in EEC, that ECPC would continue providing exclusive pathology services for GI procedures at EEC.

81.     According to the Relator, Dr. O'Neill was in favor of increasing Dr. Hemacha's income because Dr. Hemacha generated a substantial portion of Dr. O'Neill's pathology business.  Dr. O'Neill advocated paying Dr. Hemacha at high levels and providing Dr. Hemacha with a loan to purchase an income generating, ownership interest in EEC.

82.     Due to the documents and conversations at ECHN Board meetings, Dr. O'Neill was aware that ECHN was violating the Anti-Kickback Statute by allowing Dr. Hemacha to refer patients to EEC while employed by ECHN.

83.     After the ECHN Board unanimously approved the ECHN and EEC joint venture, EEC continued to use ECPC's GI pathology services, thereby preserving $1.330 million in annual Part B revenue for ECPC.  Additionally, since ECHN was no longer the site of treatment for EEC's GI patients, ECPC now received both Part A and Part B (Global) reimbursements.

84.     According to the Relator, Dr. O'Neill and Peter Karl (ECHN CEO) knew ECHN shifted Part A revenue to ECPC as a result of forming EEC.

85.     Several times, EEC had sought to outsource its pathology readings to other groups besides ECPC.  When this issue was discussed with EEC's joint venture partner ECHN, Dr. O'Neill, Peter Karl (ECHN CEO), and the Relator advised EEC that because ECHN owned 50% of EEC, EEC was required to honor an "evergreen," franchise contract between EEC and ECPC, which entitled ECPC to exclusive pathology work from EEC.

86.    According to the Relator, the fact that the formation of EEC caused ECPC to gain additional Part A technical services through billing globally for GI procedures at EEC was not revealed to the full ECHN Board or the public.

87.    ECHN's conduct to favor the interests of Dr. O'Neill, ECPC, and Dr. Hemacha show that ECHN intentionally or recklessly ignored the rules of the Anti-Kickback Statute and made financial decisions that inured to the benefit of private individuals and for-profit entities at the expense of the charitable institution ECHN.

## COUNT I
### Against All Defendants for Violations of the Federal Anti-Kickback Statute
### 42 U.S.C. § 1320a-7b(b)

88.    Relator, on behalf of Plaintiff, realleges and incorporates by reference the allegations contained in paragraphs 1 through 87 of this Complaint.

89.    EEC knowingly and willfully paid investment income to ECHN, Dr. Attam, and Dr. Hemacha, which constituted illegal remuneration paid or offered in return for the referral of business for which payment was made in whole or in part under Medicare and Medicaid.

90.    The investment income paid by EEC is not protected by any "safe harbor" of the Anti-Kickback Statute.

91.    Defendants knowingly and willfully improperly charged Medicare and Medicaid for services resulting from improper referrals to EEC.

92.    Defendants knowingly and willfully solicited or received remuneration in return for referring or arranging for the furnishing of items or services for which payment was made in whole or in part by Medicare and Medicaid.

93.    By reason of the illegal payments, Plaintiff has been damaged in a substantial amount to be determined at trial, and is entitled to a civil monetary penalties, treble damages, and costs.

## COUNT II
### Against All Defendants for Violations of the Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)-(C)

94.     Relator, on behalf of Plaintiff, realleges and incorporates by reference the allegations contained in paragraphs 1 through 93 of this Complaint.

95.     Violations of the Anti-Kickback Statute constitute a false or fraudulent claim liability under the False Claims Act. 42 U.S.C. 1320a-7b(g).

96.     Defendants knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval by the government for Medicare and Medicaid payments.

97.     In order to participate in federally-funded health care programs, Defendants expressly certified (or, through their participation in a federally funded program, impliedly certified) compliance with the Anti-Kickback Statute.

98.     Defendants made, used, or caused to be made a false record or statement material to a false or fraudulent claim in certifying compliance with the Medicare and Medicaid programs.

99.     Defendants conspired to commit a present and make the fraudulent claims alleged herein.

100.     Defendants, through their concerted efforts, conspired to defraud the federal government by getting false or fraudulent claims (those related to referrals tainted by violations of the federal Anti-Kickback Statute) allowed or paid by the government in violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(3).

101.     For each violation, Plaintiff has been damaged in a substantial amount to be determined at trial and is entitled to a civil monetary penalties, treble damages, and costs.

## COUNT III

**Against All Defendants for Violations of the Connecticut False Claims Act
Conn. Gen. Stat. § 4-275 et al.**

102.    Relator, on behalf of Plaintiff, realleges and incorporates by reference the allegations contained in paragraphs 1 through 101 of this Complaint.

103.    Defendants' violations of the Social Security Act's Anti-Kickback Statute constitute a false or fraudulent claim under the Connecticut False Claims Act.

104.    Defendants knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval by the government for Medicaid payments.

105.    In order to participate in Medicaid, Defendants expressly certified (or, through their participation in Medicaid, impliedly certified) compliance with the Anti-Kickback Statute.

106.    Defendants made, used, or caused to be made a false record or statement material to a false or fraudulent claim in certifying compliance with the Medicaid program.

107.    Defendants conspired to commit a present and make the fraudulent claims alleged herein.

108.    For each violation, Plaintiff has been damaged in a substantial amount to be determined at trial and is entitled to a civil monetary penalties, treble damages, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.    That Defendants cease and desist from violating the Social Security Act;

B.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages Plaintiff has sustained because of Defendants' actions, plus a civil penalty for each violation, plus interest;

C.    That Relator be awarded the maximum amount allowed pursuant to the Social Security Act and False Claims Act;

21

D.    That Relator be awarded the maximum amount allowed pursuant to the General Statutes of Connecticut;

E.    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

F.    That Relator recover any such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury.


Dated:  October 25, 2017


David A. Slossberg
(dslossberg@hssklaw.com)
**HURWITZ, SAGARIN, SLOSSBERG & KNUFF, LLC**
147 North Broad Street
Milford, CT 06460
Phone: 203-877-8000
Fax: 203-878-9800

*Local Counsel for Relator Kevin G. Murphy*

Stanley D. Bernstein
(bernstein@bernlieb.com)
Michael S. Bigin
(bigin@bernlieb.com)
**BERNSTEIN LIEBHARD LLP**
10 East 40th Street
New York, NY  10016
Phone: (212) 779-1414
Fax: (212) 779-3218

*Attorneys for Relator Kevin G. Murphy*